# 25-2362

## In the United States Court of Appeals for the Second Circuit

PETERSEN ENERGIA INVERSORA, S.A.U., PETERSEN ENERGIA S.A.U.,
*Plaintiffs-Appellees*,

v.

ARGENTINE REPUBLIC,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York
(No. 1:15-cv-02739) (Hon. Loretta A. Preska)

### OPENING BRIEF FOR DEFENDANT-APPELLANT THE ARGENTINE REPUBLIC

Amanda F. Davidoff
Thomas C. White
Morgan L. Ratner
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, DC 20006
(202) 956-7500
davidoffa@sullcrom.com

Robert J. Giuffra, Jr.
Sergio J. Galvis
Adam R. Brebner
Pedro José Izquierdo
Arturo Carlos Schultz
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000
giuffrar@sullcrom.com

*Attorneys for the Argentine Republic*

## CORPORATE DISCLOSURE STATEMENT

The Argentine Republic is a governmental party not required to file a corporate disclosure statement under Federal Rule of Appellate Procedure 26.1.

# TABLE OF CONTENTS

*Page*

CORPORATE DISCLOSURE STATEMENT ...................................................i

INTRODUCTION .............................................................................1

JURISDICTIONAL STATEMENT ......................................................4

STATEMENT OF THE ISSUES .........................................................7

STATEMENT OF THE CASE .............................................................8

    A.    Factual Background .................................................................8

        1.    The Republic's Expropriation of the YPF Shares .....................9

        2.    Plaintiffs' Claims and the Underlying Judgment .....................10

    B.    Post-Judgment Proceedings Before the District Court .......................13

        1.    Plaintiffs' Initial Discovery Requests .........................................13

        2.    Plaintiffs' Requests for "Alter-Ego" Discovery .......................14

    C.    The District Court's Personal Device Order ........................................17

    D.    The Republic's Efforts to Comply with the Personal Device Order .....................20

SUMMARY OF ARGUMENT .............................................................22

STANDARD OF REVIEW .................................................................24

ARGUMENT .....................................................................................25

I.    THE REPUBLIC DOES NOT "CONTROL" INFORMATION ON CURRENT AND FORMER OFFICIALS' PERSONAL DEVICES AND ACCOUNTS ....................................................26

    A.    The Republic Does Not Have the "Right" or "Authority" Under Governing Argentine Law to Access Communications on Officials' Personal Devices or Accounts .............................................27

ii

B.     The District Court Wrongly Concluded That the Republic Has the "Practical Ability" to Gather the Communications on Personal Devices ........................................................................34

**II.    DISCOVERY OF CURRENT AND FORMER OFFICIALS' PERSONAL DEVICES AND ACCOUNTS IS NEITHER RELEVANT NOR PROPORTIONAL TO THE NEEDS OF THIS CASE** ........................................................................38

A.     Discovery of Current and Former Officials' Personal Devices and Accounts Is Not Relevant to Execution .......................................39

B.     Discovery of Current and Former Officials' Personal Devices and Accounts Is Unduly Burdensome .................................................44

**CONCLUSION** ........................................................................45

iii

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Alexander Interactive, Inc.* v. *Andorama, Inc.*,
2014 WL 61472 (S.D.N.Y. Jan. 6, 2014) ........................................................27

*Am. Int'l Grp., Inc.* v. *Bank of Am. Corp.*,
712 F.3d 775 (2d Cir. 2013) ...............................................................24

*Amara* v. *Cigna Corp.*,
53 F.4th 241 (2d Cir. 2022) ...............................................................5

*Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co.*,
585 U.S. 33 (2018)..................................................................3, 24, 34

*Aurelius Cap. Master, Ltd.* v. *Republic of Argentina*,
589 Fed. Appx. 16 (2d Cir. 2014)..........................................................5, 7

*In re Austrian, German Holocaust Litig.*,
250 F.3d 156 (2d Cir. 2001) ...............................................................35

*In re Bankers Tr. Co.*,
61 F.3d 465 (6th Cir. 1995) ...............................................................26

*Blue Ridge Invs., LLC* v. *Republic of Argentina*,
735 F.3d 72 (2d Cir. 2013) ...............................................................7

*Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*,
932 F.3d 126 (3d Cir. 2019) ...............................................................43

*EM Ltd.* v. *Banco Central la República Argentina*,
800 F.3d 78 (2d Cir. 2015) ...............................................................14, 15

*EM Ltd.* v. *Republic of Argentina*,
473 F.3d 463 (2d Cir. 2007) ...............................................................39

*EM Ltd.* v. *Republic of Argentina*,
695 F.3d 201 (2d Cir. 2012) ...............................................................5, 6, 7

*First Am. Corp.* v. *Price Waterhouse LLP*,
154 F.3d 16 (2d Cir. 1998) ...............................................................37

iv

*First Nat'l City Bank* v. *Banco Para El Comercio Exterior de Cuba (Bancec)*,
    462 U.S. 611 (1983)............................................................................40

*Gujarat State Petroleum Corp.* v. *Republic of Yemen*,
    2022 WL 1567464 (S.D.N.Y. May 18, 2022) ....................................44

*Hercaire Int'l, Inc.* v. *Argentina*,
    821 F.2d 559 (11th Cir. 1987) ..............................................15, 40

*Kallas* v. *Egan*,
    842 Fed. Appx. 676 (2d Cir. 2021)........................................35

*Leslie* v. *Starbuck Corp.*,
    2024 WL 2186232 (2d Cir. May 15, 2024).............................24

*McCarthy* v. *Johnson*,
    2022 WL 3038862 (D.D.C. Aug. 2, 2022) .............................37

*Mercy Cath. Med. Ctr.* v. *Thompson*,
    380 F.3d 142 (3d Cir. 2004) ................................................26

*Mirlis* v. *Greer*,
    80 F.4th 377 (2d Cir. 2023) .................................................26

*Mohawk Indus., Inc.* v. *Carpenter*,
    558 U.S. 100 (2009)..............................................................7

*Monegasque De Reassurances S.A.M.* v. *Nak Naftogaz of Ukraine*,
    311 F.3d 488 (2d Cir. 2002) ...............................................25

*NML Cap., Ltd.* v. *Republic of Argentina*,
    2011 WL 1533072 (S.D.N.Y. Apr. 22, 2011) .......................15

*NML Cap., Ltd.* v. *Republic of Argentina*,
    2015 WL 7731779 (N.D. Cal. Dec. 1, 2015)..........................15

*NML Cap., Ltd.* v. *Republic of Argentina*,
    892 F. Supp. 2d 530 (S.D.N.Y. 2012) ..................................15

*Owen* v. *Elastos Found.*,
    2023 WL 2537287 (S.D.N.Y. Mar. 16, 2023)........................29

*In re Papandreou*,
139 F.3d 247 (D.C. Cir. 1998) .................................................................6

*Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*,
2016 WL 4735367 (S.D.N.Y. Sept. 9, 2016) ................................5, 10

*Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*,
2020 WL 3034824 (S.D.N.Y. June 5, 2020) ......................................11

*Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*,
2023 WL 2746022 (S.D.N.Y. Mar. 31, 2023) ....................................11

*Peterson* v. *Bank Markazi*,
121 F.4th 983 (2d Cir. 2024) ...............................................................43

*Pollux Holding Ltd.* v. *Chase Manhattan Bank*,
329 F.3d 64 (2d Cir. 2003) ...................................................................25

*Reiter* v. *MTA N.Y. City Transit Auth.*,
457 F.3d 224 (2d Cir. 2006) .................................................................24

*Republic of Argentina* v. *NML Cap., Ltd.*,
573 U.S. 134 (2014)..........................................................................5, 39

*Royal Park Invs. SA/NV* v. *Deutsche Bank Nat'l Tr. Co.*,
2016 WL 5408171 (S.D.N.Y. Sept. 27, 2016) ...................................28

*Royal Park Invs. SA/NV* v. *Deutsche Bank Nat'l Tr. Co.*,
2018 WL 4682220 (S.D.N.Y. Sept. 28, 2018) ...................................39

*Scott* v. *Arex, Inc.*,
124 F.R.D. 39 (S.D.N.Y. 1989) ...........................................................28

*Searock* v. *Stripling*,
736 F.2d 650 (11th Cir. 1984) .............................................................27

*Seijas* v. *Republic of Argentina*,
2009 WL 10700009 (S.D.N.Y. Aug. 19, 2009)..................................15

*Seijas* v. *Republic of Argentina*,
502 Fed. Appx. 19 (2d Cir. 2012).................................................15, 40

vi

*Shcherbakovskiy* v. *Da Capo Al Fine, Ltd.*,
  490 F.3d 130 (2d Cir. 2007) ............................................................26, 28, 29, 38

*Société Nationale Industrielle Aérospatiale* v. *U.S. Dist. Ct. for
  S. Dist. of Iowa*,
  482 U.S. 522 (1987) ........................................................................45

*Strike 3 Holdings, LLC* v. *Doe*,
  964 F.3d 1203 (D.C. Cir. 2020) ........................................................38

*Swarna* v. *Al-Awadi*,
  622 F.3d 123 (2d Cir. 2010) .............................................................7

*Tulip Computs. Int'l B.V.* v. *Dell Comput. Corp.*,
  254 F. Supp. 2d 469 (D. Del. 2003) ..................................................37

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  2023 WL 5322019 (S.D.N.Y. Mar. 8, 2023) ......................................37

*Underwood* v. *Coinbase Glob., Inc.*,
  2025 WL 1984293 (S.D.N.Y. July 17, 2025) ....................................39

*Vaigasi* v. *Solow Mgmt. Corp.*,
  2016 WL 616386 (S.D.N.Y. Feb. 16, 2016) ......................................38

**U.S. Statutes and Rules**

5 U.S.C. § 552 ..................................................................................32, 34

28 U.S.C. § 1291 ...................................................................................5

28 U.S.C. § 1330 ...................................................................................4

28 U.S.C. § 1605 ...................................................................................5

28 U.S.C. § 1610 .................................................................................42

Fed. R. Civ. P. 26 ...........................................................................1, 35, 38

Fed. R. Civ. P. 34 ..........................................................................*passim*

Fed. R. Civ. P. 69 ...............................................................................26

**Argentine Constitution, Statutes, and Decrees**

Argentine Constitution, Art. 17 .................................................................30

Argentine Constitution, Art. 18 .................................................................30

Argentine Constitution, Art. 19 .................................................................30

Argentine Criminal Code, Art. 153.............................................................31

Argentine Criminal Code, Art. 153 *bis*....................................................31

Personal Data Protection Law, Law No. 25,326.......................................17

Right of Access to Public Information Law, Law No. 27,275 .................32

YPF Expropriation Law, Law No. 26,741 ..................................................9

Decree No. 206/2017 ....................................................................................32

Decree No. 780/2024 ....................................................................................33

# INTRODUCTION

This appeal concerns an extraordinary post-judgment order purporting to require the Argentine Republic, in violation of its own laws, to produce communications from the personal devices and accounts of high-ranking Argentine officials, including even cabinet-level ministers. The district court's order fails the basic requirements under Federal Rules of Civil Procedure 26 and 34 for ordering such discovery from the Republic: (i) the Republic lacks control over those personal devices under governing Argentine law, and (ii) any communications on those personal devices are neither relevant nor proportional post-judgment discovery. The order also rewards the troubling tactics of the litigation funder bank-rolling this case: to use the discovery process to throw "sand in the gears" of the Republic's efforts to stabilize its economy, and ultimately to force a settlement before this Court can decide the Republic's pending appeal on the merits.

That pending appeal is from a combined $16.1 billion judgment against the Republic (now more than $18 billion including post-judgment interest), based entirely on Argentine law. As part of their extensive post-judgment discovery into the Republic's assets, plaintiffs have sought documents concerning the Republic's relationships with five Argentine entities that plaintiffs allege are alter egos of the Republic. Plaintiffs have argued that communications on Argentine officials' personal cellphones and messaging applications *may* contain evidence of the

Republic's relationships with those Argentine entities. Over the Republic's objection that it lacks possession, custody, or control of such communications under Federal Rule of Civil Procedure 34, the district court ordered the Republic to produce communications on dozens of current and former senior officials' personal devices and accounts. After the Republic moved for reconsideration, the district court recognized that Argentine law determines whether, as a legal or practical matter, the Republic has control of such communications. But it misunderstood Argentine law.

The district court's order and reconsideration denial (together, the Personal Device Order) is merely its latest decision to misconstrue both U.S. and Argentine law and to bless plaintiffs' vexatious litigation methods. Indeed, plaintiffs have made clear that execution is "not in and of itself the goal" of seeking the burdensome discovery demanded here. J.A. 1172; *see id.* (admitting that "we will try many gambits that won't work as a strictly legal matter"). Although the Republic has spent the past two years, including thousands of hours of outside-counsel time and thousands more hours of work by government officials, responding to plaintiffs' onerous and pretextual discovery requests, and has produced more than 100,000 pages of post-judgment discovery, the Personal Device Order goes too far. It misconstrues both U.S. and Argentine law, and this Court should reverse.

*First*, the district court's Personal Device Order wrongly concludes that the request falls within Rule 34 because the Republic has "control" over personal

devices and accounts belonging to high-ranking government officials. Plaintiffs have the burden to establish "control," which in these circumstances requires consideration of Argentine law. They did not satisfy that burden here. Under the Argentine Constitution, personal devices and accounts are solely under the control of their individual owners, and it would violate the Argentine Criminal Code for the Republic to forcibly access such personal property outside of a criminal case in an Argentine court. Notwithstanding the Supreme Court's admonition in *Animal Science Products, Inc.* v. *Hebei Welcome Pharmaceutical Co.*, 585 U.S. 33, 36 (2018), the district court failed to give "respectful consideration" to the Republic's interpretation of its own laws, supported by an Argentine-law expert. The district court's order instead rests on a novel interpretation of Argentine law that no Argentine court has ever adopted.

The district court alternatively suggested that the Republic has the "practical ability" to "receive the communications" by "request[ing] the consent of the individual officials," "amend[ing] [its] law by statute" or "order[ing] it through the Argentine courts." S.A. 83-84. In a good-faith effort to comply with the district court's order, the Republic has sought cooperation from each of the proposed custodians and is in the process of collecting relevant communications from the individuals who have agreed to cooperate. It has also encouraged plaintiffs—to no avail—to seek letters rogatory to an Argentine court under the Hague Convention

3

on the Taking of Evidence Abroad in Civil or Commercial Matters. But plaintiffs still are not satisfied. The district court's other alternatives are plainly unavailable. A U.S. court cannot bootstrap its way into "control" under Rule 34 by ordering the Republic to change its laws or direct its courts to order compliance.

*Second*, even if the Republic had control over current and former officials' personal devices and accounts, discovery of such materials is neither relevant nor proportional post-judgment discovery in this action. It is not relevant because, no matter what plaintiffs speculate they might find, their search is not directed to executable assets. And even if this discovery were conceivably relevant, it would be plainly disproportional. Plaintiffs' speculative alter-ego theories are not sufficient to justify such burdensome and invasive discovery, which carries a high risk of international conflict. None of the more than 100,000 pages of post-judgment discovery produced by the Republic supports plaintiffs' speculative alter-ego theories. Unprecedented discovery orders like this one should not rest on plaintiffs' blind hope that they will find a smoking gun in officials' personal devices and accounts—contrary to all of the other evidence produced to date.

For either of those reasons, this Court should reverse.

## JURISDICTIONAL STATEMENT

The district court asserted subject-matter jurisdiction over this case under 28 U.S.C. § 1330(a), after concluding that the FSIA's commercial-activity exception

4

applied. *Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, 2016 WL 4735367, at *7 (S.D.N.Y. Sept. 9, 2016), *aff'd*, 895 F.3d 194, 209 (2d Cir. 2018), *cert. denied*, 588 U.S. 906 (2019); *see* 28 U.S.C. § 1605(a)(2).

The district court initially ordered plaintiffs' requested discovery on July 29, 2025, and denied reconsideration on August 27, 2025. The Republic timely filed its notices of appeal on September 26, 2025. J.A. 1440.

This Court has jurisdiction under 28 U.S.C. § 1291 and the collateral-order doctrine. Post-judgment discovery orders are typically appealable under the collateral-order doctrine where, as here, the order compels discovery of a foreign sovereign's foreign assets. *See Aurelius Cap. Master, Ltd.* v. *Republic of Argentina*, 589 Fed. Appx. 16, 17 (2d Cir. 2014); *EM Ltd.* v. *Republic of Argentina*, 695 F.3d 201, 206 (2d Cir. 2012), *aff'd*, 573 U.S. 134 (2014). As these cases confirm, in the "post-judgment context," this Court "give[s] less weight to the inconvenience and costs of piecemeal review and correspondingly greater weight to the danger of denying justice by delay." *Amara* v. *Cigna Corp.*, 53 F.4th 241, 250 (2d Cir. 2022) (quotations omitted).

More generally, an order is immediately appealable under the collateral-order doctrine if it "(1) conclusively determines a disputed question; (2) resolves an important issue completely separate from the merits of the action; and (3) is

5

effectively unreviewable on appeal." *EM Ltd.*, 695 F.3d at 205. Each requirement is met here.

*First*, the Personal Device Order "represent[s] [the district court's] final determination" that the Republic has control over the personal devices and accounts of its current and former officials under Rule 34(a)(1). *EM Ltd.*, 695 F.3d at 206.

*Second*, the Personal Device Order resolves an important issue completely separate from the merits of the underlying action by requiring intrusive post-judgment discovery from high-level Argentine officials. That is critically important as a matter of international relations and comity. Plaintiffs also have made clear that if the Republic is unable to fully comply with the Personal Device Order, they intend to seek sanctions. The risk of sanctions against a foreign sovereign, and the ensuing international conflict, further necessitates this Court's immediate review. *See In re Papandreou*, 139 F.3d 247, 251 (D.C. Cir. 1998) ("Respondents' suggestion that [foreign ministers] should be forced to take the contempt route betrays a misunderstanding of immunity or diplomacy or both.").

*Third*, the Personal Device Order is effectively unreviewable. For starters, the order would risk serious legal liability for the Republic *in Argentina*, which U.S. courts cannot undo even if the Republic wins on appeal here or wins on its appeal of the underlying judgment. This Court has repeatedly reviewed under the collateral-order doctrine otherwise non-final orders affecting sovereigns that "conclusively

6

resolve important issues that are separate from the merits and unreviewable from final judgment." *Aurelius*, 589 Fed. Appx. at 16-17 (citations omitted) (collecting cases presenting issues of sovereign immunity or treaty interpretation).[1]  Here, delaying review of the Personal Device Order would "imperil" the "high order" sovereign interests that this Court has recognized are worthy of immediate review. *Mohawk Indus., Inc.* v. *Carpenter*, 558 U.S. 100, 100-101 (2009); *see Aurelius*, 589 Fed. Appx. at 16-17.  By requiring the Republic to seize the personal devices and accounts of its high-ranking government officials in plain contravention of Argentine law, the district court's order is a sovereign intrusion of the highest order and a violation of the most basic comity principles.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in holding that current and former Argentine government officials' communications on their personal devices or accounts are in the Republic's "possession, custody, or control" under governing Argentine law.

---

[1]  *See also, e.g.*, *E.M. Ltd.*, 695 F.3d at 205-206; *Blue Ridge Invs., LLC* v. *Republic of Argentina*, 735 F.3d 72, 81 (2d Cir. 2013) (applying collateral-order doctrine to district court's ruling "that Argentina waived its sovereign immunity"); *Swarna* v. *Al-Awadi*, 622 F.3d 123, 140-141 (2d Cir. 2010) (applying collateral-order doctrine to district court's "interpretation of the Vienna Convention's provision on residual immunity").

2.      Whether the district court erred in holding that post-judgment discovery of communications from the personal devices and accounts of current and former government officials was relevant and proportional to the needs of the case.

## STATEMENT OF THE CASE

This appeal relates to an unprecedented post-judgment discovery order by the district court (Preska, J.) directing the Argentine Republic, in violation of its own laws, to produce communications from the personal devices (*e.g.*, cellphones) and accounts (*e.g.*, WhatsApp) of high-ranking current and former Argentine government officials, including even cabinet-level ministers.  Plaintiffs sought this intrusive discovery as part of their post-judgment efforts to execute on the district court's combined $16.1 billion judgment against the Republic (now over $18 billion, including post-judgment interest), while the appeal of that judgment is separately pending before this Court.  *See Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, Nos. 23-7370, 23-7463; *Eton Park Cap. Mgmt., L.P.* v. *Argentine Republic*, Nos. 23-7376, 23-7471.

### A.      Factual Background

The facts and proceedings leading to the underlying judgment are detailed in the Republic's opening brief in *Petersen*, No. 23-7370, ECF No. 228 (2d Cir. filed Sept. 6, 2024).  The key facts relevant to the Personal Device Order and this appeal are below.

8

### 1.     The Republic's Expropriation of the YPF Shares

Plaintiffs' claims relate to the 2012 intervention in Argentina's largest energy company, YPF, and subsequent 2014 expropriation of a 51% stake in the company. *See* YPF 2023 Form 20-F, D. Ct. Dkt. 591-3 at 10, 89.[2]  Before the intervention, YPF had fallen into serious decline under the control of Spanish oil company Repsol S.A. and the Petersen Group, a privately held Argentine conglomerate owned by the Argentine Eskenazi family.  *See* J.A. 1706-1708, 1712-1714.  In May 2012, the Argentine Congress enacted the YPF Expropriation Law, Law No. 26,741.  J.A. 1716.  To promote the "national public interest" in "[a]chieving [hydrocarbon] self-sufficiency," the YPF Expropriation Law "declared [of] public interest and subject to expropriation" 51% of the equity of YPF.  YPF Expropriation Law Arts. 1, 7, D. Ct. Dkt. 363-72 at 1, 3.

After enactment of the YPF Expropriation Law, Repsol and various YPF minority shareholders brought claims asserting that the Republic had violated YPF's bylaws by assuming control over the YPF Shares without making a tender offer.  J.A. 1718-1719.  Those claims were ultimately resolved as part of the expropriation in 2014, through a settlement agreement in which the Republic paid Repsol

---

[2]  District court materials cited in the brief and joint appendix are from the docket in *Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, No. 15-cv-02739 (S.D.N.Y.).

$5 billion for its shares, and Repsol agreed to secure the discontinuance of all claims brought by third parties in Argentina over the expropriation. J.A. 1721-1722. Petersen and Eton Park elected not to participate or assert any claims against the Republic at that time. J.A. 1719.

### 2. Plaintiffs' Claims and the Underlying Judgment

In March 2015, litigation funder Burford Capital acquired the right to pursue Petersen's claims for approximately €15 million. J.A. 1723-1724. In April 2015, Petersen sued the Republic and YPF in the Southern District of New York. J.A. 174. Petersen brought an unprecedented claim for "breach of contract," alleging principally that the Republic had violated YPF's bylaws by "acqui[ring] . . . a controlling stake in YPF" without making a tender offer to other shareholders. J.A. 194. Eton Park, also funded by Burford, filed a copycat complaint in 2016. J.A. 1724.

The Republic moved to dismiss Petersen's complaint on sovereign-immunity grounds. *See Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, 2016 WL 4735367, at *4 (S.D.N.Y. Sept. 9, 2016). The district court denied the Republic's motion, and this Court affirmed. *See id.* at *16, *aff'd*, 895 F.3d 194 (2d Cir. 2018), *cert. denied*, 588 U.S. 906 (2019).

On remand, the Republic renewed its motion to dismiss on *forum non conveniens* grounds, which the district court denied. *Petersen Energía Inversora,*

10

*S.A.U.* v. *Argentine Republic*, 2020 WL 3034824, at \*14 (S.D.N.Y. June 5, 2020). After discovery, without holding oral argument, the district court granted summary judgment to plaintiffs on their entirely Argentine-law claims against the Republic. *Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, 2023 WL 2746022, at \*4, \*20 (S.D.N.Y. Mar. 31, 2023). In doing so, the court repeatedly misconstrued Argentine law, including by (i) recognizing the first-ever breach-of-contract action for damages based on corporate bylaws; (ii) disregarding YPF's bylaws' exclusive penalty provision; and (iii) overriding Argentina's comprehensive public-law system for third-party claims arising from an expropriation. The court later acknowledged that it had decided "issues of first impression" and "questions of Argentine law." J.A. 211.

After a short bench trial on damages, the court awarded the Petersen plaintiffs approximately $14.4 billion in damages and prejudgment interest, and the Eton Park plaintiffs approximately $1.7 billion. J.A. 206-207. Including post-judgment interest, the combined judgment has grown to more than $18 billion. The Republic appealed that judgment, which was argued before this Court on October 29 before Judges Cabranes, Chin, and Robinson. That appeal effectively requires this Court to act as an Argentine appellate court on the many controlling Argentine-law issues that the district court wrongly decided.

11

In June 2025, without oral argument and while the merits appeal was pending, the district court ordered the Republic to transfer its 51% share in YPF, held in Argentina, to a non-party New York bank for turnover to plaintiffs in partial satisfaction of the judgment (the Turnover Order). J.A. 1237-1239. That extraordinary order purports to require the Republic to surrender its foreign-sovereign property located within its own borders, in direct violation of an Argentine law expressly forbidding a transfer of the YPF shares absent a two-thirds affirmative vote of the Argentine National Congress. *See* YPF Expropriation Law Art. 10, D. Ct. Dkt. 363-72 at 4. The Republic appealed the Turnover Order to this Court, because it contravenes longstanding federal common law, misinterprets the New York C.P.L.R., violates the Foreign Sovereign Immunities Act, and violates international comity and the act-of-state doctrine. *See Petersen Energía Inversora, S.A.U.* v. *Argentine Republic*, No. 25-1687; *Eton Park Cap. Mgmt., L.P.* v. *Argentine Republic*, No. 25-1689. The U.S. government and seven foreign sovereigns support the Republic's appeal. *See Petersen*, No. 25-1687, ECF Nos. 71, 78, 83, 88 (amicus briefs of United States, Republic of Chile, Italian Republic, Romania, Ukraine, Oriental Republic of Uruguay, Republic of Ecuador, and State of Israel). That appeal will be fully briefed on December 12, 2025.

### B.    Post-Judgment Proceedings Before the District Court

### 1.    Plaintiffs' Initial Discovery Requests

In October 2023, plaintiffs served their first set of requests for post-judgment discovery, and the Republic promptly served its responses and objections.  J.A. 220. Plaintiffs' first requests were "directed to identifiable documents or 'documents sufficient to identify' the Republic's assets, legal or beneficial interests in assets, financial accounts, debts, financial agreements with China, transactions, letters of credit, gold reserves, and escrow accounts, among others."  J.A. 1503.

From November 2023 to May 2024, the parties engaged in 11 meet-and-confer discussions concerning plaintiffs' requests.  J.A. 1503.  In light of these discussions, the Republic prioritized two categories of discovery:  (1) requests regarding its YPF shares and (2) requests regarding assets outside of Argentina. J.A. 1503.  As to the Republic's YPF shares, the Republic conducted reasonable searches and produced YPF shareholder meeting minutes, share certificates, Form 20-Fs, administrative files from the Repsol settlement, and a transfer agreement between the Argentine central government and several of its provinces. J.A. 1503.  Regarding the Republic's assets in the United States or any foreign country, the Republic produced, for example, documents sufficient to identify financial agreements between Chinese financial entities and the Republic, a letter of credit, peso-denominated debt instruments, foreign-currency-denominated debt,

deeds for properties used for diplomatic and consular purposes, and deeds for properties used for national defense and military purposes. J.A. 1503. The Republic also has produced, or is in the process of producing, interbank (SWIFT) messages accompanying the Republic's cross-border transactions initiated or received by the Republic's accounts held at financial institutions both in and outside of Argentina and accounting ledgers created pursuant to Argentine law containing all transactions made in connection with any account held by an Argentine embassy or consulate abroad.

### 2. Plaintiffs' Requests for "Alter-Ego" Discovery

Beyond seeking broad discovery regarding the Republic's worldwide assets, plaintiffs also served discovery requests directed to the Republic's alleged alter-ego relationships with six Argentine entities: Aerolíneas Argentinas, S.A. (Aerolíneas), Banco Central de la República Argentina (BCRA), Banco de la Nación Argentina (BNA), Empresa Argentina de Soluciones Satelitales, S.A. (ARSAT), Energía Argentina, S.A. (ENARSA), and YPF. J.A. 1505. The Republic objected to the alter-ego requests because the entities "are not alter egos of the Republic and therefore their assets are not subject to attachment or execution to satisfy a judgment against the Republic." J.A. 262 (citing *EM Ltd.* v. *Banco Central la República Argentina*, 800 F.3d 78, 99 (2d Cir. 2015)). This Court and other federal courts have already held that each of these entities—Argentina's central bank (BCRA), a major

14

Argentine bank (BNA), two major Argentine energy companies (YPF and ENARSA), an Argentine telecommunications company (ARSAT), and Argentina's largest airline (Aerolíneas)—is a separate entity, not an "alter ego" of the Republic.[3] The Republic also objected to the alter-ego requests "to the extent they purport[ed] to require the Republic to collect or review documents outside the scope of the Republic's normal business operations, such as text messages, electronic chats, personal files, or personal e-mails" or "provide information that is in the possession, custody, or control of any individual, agency, or instrumentalities of the Republic with legal identities separate and apart from those of the Republic." J.A. 226-227.

In May 2024, plaintiffs submitted a pre-motion letter "request[ing] that the Court order the Republic to produce documents responsive to" plaintiffs' alter-ego requests. D. Ct. Dkt. 568 at 2. Plaintiffs stated that they "seek this discovery to determine whether any of the [identified entities] is *currently* an alter ego of the Republic." *Id.* Plaintiffs' letter did not mention anything about seeking documents

---

[3] *See NML Cap., Ltd.* v. *Republic of Argentina*, 2015 WL 7731779, at *4 (N.D. Cal. Dec. 1, 2015) (YPF); *Seijas* v. *Republic of Argentina*, 2009 WL 10700009, at *2 (S.D.N.Y. Aug. 19, 2009) (Aerolíneas); *Hercaire Int'l, Inc.* v. *Argentina*, 821 F.2d 559, 565 (11th Cir. 1987) (same); *NML Cap., Ltd.* v. *Republic of Argentina*, 2011 WL 1533072, at *6 (S.D.N.Y. Apr. 22, 2011) (ARSAT), *vacated and remanded on mootness grounds*, 497 Fed. Appx. 96 (2d Cir. 2012); *EM Ltd.* v. *Banco Central de la República Argentina*, 800 F.3d 78, 94-95 (2d Cir. 2015) (BCRA); *Seijas* v. *Republic of Argentina*, 502 Fed. Appx. 19, 22 (2d Cir. 2012) (BNA); *NML Cap., Ltd.* v. *Republic of Argentina*, 892 F. Supp. 2d 530, 533 (S.D.N.Y. 2012) (ENARSA).

on personal accounts and devices. *Id.* In response, the Republic argued that "[b]ecause Plaintiffs have made no showing calling into question the conclusions of multiple courts that each of the Entities is not the Republic's alter ego, the Court should not permit Plaintiffs to seek discovery that is 'simply not "relevant" to execution in the first place.'" D. Ct. Dkt. 572 at 3.

The district court initially granted plaintiffs' request to conduct alter-ego discovery as to YPF and BCRA for a two-year period. J.A. 378. But the court rejected plaintiffs' request as to the four other entities (BNA, Aerolíneas, ENARSA, and ARSAT). J.A. 363.

In June 2024, plaintiffs sent the Republic their "Custodian and Search Term Proposals for Plaintiffs' Alter Ego Requests." J.A. 1506. Plaintiffs proposed that the Republic conduct searches of custodians' government emails, but did not propose searching custodians' personal devices or accounts. J.A. 1506. The Republic disputed the need to search even government emails in response to plaintiffs' alter-ego requests, but nevertheless agreed to perform those email searches with regard to YPF and BCRA. J.A. 1506-1507.

To date, the Republic has produced more than 100,000 pages of post-judgment discovery, and it is continuing to make rolling productions.

## C.    The District Court's Personal Device Order

In August 2024—nearly a year after serving their requests for production and months after the Republic had agreed to produce government email and other communications regarding the alleged alter-ego entities—plaintiffs for the first time requested searches of the custodians' communications on their personal cellphones and messaging applications.  D. Ct. Dkt. 641 at 3.  The targeted custodians include the Republic's current Minister of Economy (Luis Caputo), the prior administration's Minister of Economy (Sergio Massa), the prior administration's Secretary of Commerce (Matías Tombolini), the current Secretary of Treasury (Carlos Guberman), as well as dozens of other senior officials.  D. Ct. Dkt. 641-4 at 2.

The Republic objected.  It explained to the district court that under Argentina's Personal Data Protection Law, Law No. 25,326, it could not "legally produce communications from officials' personal accounts and devices (such as Gmail or WhatsApp) without obtaining their consent."  D. Ct. Dkt. 641 at 6.  The parties then briefed the issue.  *See* D. Ct. Dkts. 658, 670, 677.  The Republic submitted two declarations of Argentine-law expert Dr. Miriam Mabel Ivanega.  J.A. 412; J.A. 1141.  Dr. Ivanega explained that "[u]nder Argentine law, such personal devices and accounts, as well as any content generated on or through them, are the private property of such officials and [the Republic] has no possession,

17

control or custody of them." J.A. 414. As a result, the Republic may not "collect or deliver to third parties the personal devices and accounts without the express authorization of the owner of such devices and accounts." J.A. 414.

On July 29, 2025, the district court nevertheless ordered the Republic to collect and produce communications on the personal cellphones and messaging applications of high-ranking current and former Argentine government officials (referred to in the order as "off-channel communications"). S.A. 53. The court also ordered discovery concerning the Republic's relationship with BNA, ENARSA, and Aerolíneas (in addition to the previously ordered discovery as to YPF and BCRA), but denied discovery as to ARSAT. S.A. 63, 65, 66. Citing a vague press report "that President Milei uses WhatsApp for messages and calls to another government official 'at any time of day or night,'" the court "note[d] that it seems obvious that these officials are conducting official business on their personal accounts." S.A. 53. The court did not clearly address whether the Republic has possession, custody, or control over personal devices and accounts under Rule 34, reasoning only that a "comity analysis weighs in favor of collecting and reviewing off-channel communications to help plaintiffs determine whether [certain] state-owned entities are alter egos." S.A. 53.

The Republic timely sought reconsideration. J.A. 1319; J.A. 1405; J.A. 1407. It explained that the district court had "overlooked the threshold question, necessary

for any discovery under the Federal Rules of Civil Procedure, of whether personal devices and accounts are within the Republic's 'possession, custody, or control,'" which depends on Argentine law. J.A. 1409 (citing Fed. R. Civ. P. 34(a)(1)). It further explained that, given the constraints of Argentine law, the Republic does not have possession, custody, or control of officials' personal devices and accounts. J.A. 1411.

On August 27, the district court denied the motion for reconsideration. S.A. 73. The court acknowledged that it was "undisputed that the Republic lacks 'possession' or 'custody' of the communications" under Rule 34, meaning that "the question turns on whether the Republic has 'control' over the communications." S.A. 77. On control, the district court first held that relevant Argentine law "do[es] not foreclose the finding that officials['] off-channel communications relating to 'state activity' can be deemed 'public information,'" and thus legally in the Republic's control. S.A. 83. In the alternative, the district court reasoned that, even if the communications were not "public information" under Argentine law, the Republic "still has the 'practical ability' to receive the communications" in one of three ways. S.A. 83-84. According to the court, the Republic could (1) "request the consent of the individual officials"; (2) "amend the law by statute"; or (3) "order it through the Argentine courts." S.A. 83-84.

**D.** **The Republic's Efforts to Comply with the Personal Device Order**

In a good-faith effort to comply with the Personal Device Order and foreclose the need for this appeal, the Republic is seeking its officials' voluntary cooperation. J.A. 1567. That difficult and legally fraught process is ongoing. The Republic has requested voluntary cooperation from each of the 36 custodians identified to date, including such high-ranking officials as the current and former Ministers of the Economy, several former Chiefs of Cabinet, and current or former Secretaries of Finance, Treasury, Energy, and Transportation. The Republic has undertaken this effort despite plaintiffs' having offered only one-off rumors in news articles that certain government officials sometimes communicate with each other via WhatsApp or other messaging platforms, without any specificity as to the content of those messages or indication that they relate to official business. *See, e.g.*, J.A. 1487; J.A. 1493.

On November 10, 2025, the Republic updated plaintiffs about how each individual has responded to the request for voluntary cooperation, including that nearly all of the officials from the current administration from whom the Republic has received a response have voluntarily agreed to provide their communications, if any, on their personal devices and accounts on non-governmental, web-based platforms. Several current and former officials, by contrast, have declined consent, citing their rights under Argentine law. The Republic is in the process of collecting

relevant communications from the individuals who have agreed to provide them, and will begin making rolling productions as soon as feasible. J.A. 1672. Nevertheless, plaintiffs have taken the position that "[w]hether or not [the Republic] represents these people consented is irrelevant" because plaintiffs believe they are "entitled" to all the communications from all the targeted custodians, regardless of consent. J.A. 1673. On November 17 (the day of this filing), plaintiffs reiterated their position that the Republic must produce communications from the personal devices and accounts of all custodians, even those who have asserted their right not to produce such communications under Argentine law.

The Republic also has repeatedly suggested that plaintiffs seek letters rogatory to an Argentine court under the Hague Convention, which is the typical avenue to obtain documents from a foreign non-party. J.A. 1606. But plaintiffs have refused to do so, even though the Hague procedure is the clearest pathway for them to seek the documents they claim to need. J.A. 1615 ("we don't believe we have any obligation for a party to go exercise Hague convention obligations or rights").

Throughout this dispute, plaintiffs have made it clear that their objective is "contempt sanctions." J.A. 1614; *see* J.A. 1670 (arguing that if the Republic does not produce all the requested materials, "then you should set a hearing; we should have a contempt proceeding"). Indeed, plaintiffs have suggested that they hope to shore up their speculative alter-ego theories through this discovery dispute, by

21

seeking "an adverse inference on all the alter ego stuff." J.A. 1614; *see* J.A. 1608 (explaining that, if the Republic cannot produce the requested documents, plaintiffs "will move to determine the appropriate remedy," including "adverse inferences"); J.A. 1627 ("if [the Republic] do[es]n't want to produce them, draw an adverse inference").

## SUMMARY OF ARGUMENT

I.    Federal Rule of Civil Procedure 34 makes clear that a party can be subject to discovery requests only for materials within its "possession, custody, or control." The district court's Personal Device Order rests on the incorrect legal determination that the Republic has "control" over its current and former officials' personal devices and communications under Argentine law.

A.    Plaintiffs have failed to meet their burden of establishing such control under Argentine law. To the extent U.S. companies may exert control over their employees' personal devices and accounts by threatening termination, the same is not true in Argentina. Under the Argentine Constitution's "inviolable" right to personal property, personal devices and accounts are solely in the control of their individual owners. Indeed, it would violate the Argentine Criminal Code for the Republic to seize or access such personal property outside of a criminal proceeding before an Argentine court. The Republic has no control—legal or practical—over such personal property.

B.    The district court's alternative holding that the Republic has the "practical ability" to "receive the communications" by "request[ing] the consent of the individual officials," "amend[ing] [its] law by statute," or "order[ing] it through the Argentine courts," S.A. 83-84, is equally misguided.  The Republic has sought cooperation; some officials have granted consent, while others have asserted their legal right not to consent.  As to those refusals, the district court has no authority to order the Republic to change its own sovereign law or direct its courts to order compliance.  The only appropriate way to obtain an order of an Argentine court is through letters rogatory under the Hague Convention, which plaintiffs have refused to seek.

II.    Even if the Republic had control within the meaning of Rule 34, discovery of current and former officials' personal devices and accounts fails to meet the most basic standard for any discovery because it is not relevant or proportional to the post-judgment needs of the action.

A.    The discovery is not relevant because it is not directed to executable assets.  Plaintiffs have never explained why personal devices and accounts have any relevance to execution beyond invoking their speculative alter-ego theories, which this Court and other courts already have rejected.  And plaintiffs have made no showing that discovery of personal devices and accounts would uncover any information relevant to their alter-ego theories.  Furthermore, even if plaintiffs could

23

use personal-device discovery to attempt to establish that the five entities are alter egos of the Republic, that still would not lead to executable assets because execution would be barred by the FSIA, and because the district court would not have jurisdiction over those alleged alter egos regardless.

B.     The proportionality requirement means that the lack of relevance must be weighed against the substantial burden faced by the Republic.  The burden is at its apex here, where the district court is ordering intrusive discovery from high-ranking officials of a foreign sovereign.  That burden substantially outweighs any speculative relevance.

## STANDARD OF REVIEW

This Court reviews questions of law *de novo*.  *See Am. Int'l Grp., Inc.* v. *Bank of Am. Corp.*, 712 F.3d 775, 778 (2d Cir. 2013).  Such questions of law include interpretation of the Federal Rules of Civil Procedure, *see Reiter* v. *MTA N.Y. City Transit Auth.*, 457 F.3d 224, 229 (2d Cir. 2006), and determinations of foreign law, *see Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co.*, 585 U.S. 33, 42 (2018).  U.S. courts "should accord respectful consideration to a foreign government's" interpretation of its own country's laws.  *Id.* at 36.

This Court reviews a decision about the proportionality of a discovery request for abuse of discretion.  *Leslie* v. *Starbuck Corp.*, 2024 WL 2186232, at *5 & n.8 (2d Cir. May 15, 2024).  A court abuses its discretion when "(1) [the court's]

24

decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Monegasque De Reassurances S.A.M.* v. *Nak Naftogaz of Ukraine*, 311 F.3d 488, 498 (2d Cir. 2002) (citation omitted). A court also abuses its discretion when it "fails to consider all the relevant factors or unreasonably balances those factors." *Pollux Holding Ltd.* v. *Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003).

## ARGUMENT

The district court's Personal Device Order directs the Republic to produce communications on personal devices and accounts of high-ranking Argentine officials—including the current and former Ministers of the Economy, several former Chiefs of Cabinet, and current or former Secretaries of Finance, Treasury, Energy, and Transportation—in service of a fishing expedition into entities that this Court and others have repeatedly found *not* to be alter egos. That unprecedented order is wrong for two independent reasons. *First*, it incorrectly determines that the Republic has "control" over its current and former officials' personal accounts and devices, when Argentine law says otherwise. *Second*, it permits post-judgment discovery into documents that are neither relevant nor proportional to plaintiffs' needs. For either reason, this Court should reverse.

## I.   THE REPUBLIC DOES NOT "CONTROL" INFORMATION ON CURRENT AND FORMER OFFICIALS' PERSONAL DEVICES AND ACCOUNTS.

Rule 69 of the Federal Rules of Civil Procedure authorizes post-judgment discovery "[i]n aid of the judgment or execution . . . as provided in these rules." Rule 34, in turn, provides that a party may request "documents or electronically stored information" "in the responding party's *possession, custody, or control*." Fed. R. Civ. P. 34(a)(1) (emphasis added).  As this Court has recognized, "a party is not obliged to produce, at the risk of sanctions, documents that it does not possess or cannot obtain."  *Shcherbakovskiy* v. *Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007).  Here, the district court correctly recognized that "the Republic lacks 'possession' or 'custody' of the communications" at issue.  S.A. 77.  Therefore, the district court could order the Republic to produce these communications only if the Republic is deemed to have "control" of the communications.

In this Circuit, "documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents." *Mirlis* v. *Greer*, 80 F.4th 377, 382 (2d Cir. 2023) (citation omitted).[4]  Where "control

---

[4]   The Second Circuit standard departs from the standard in other circuits, which focus solely on legal ability.  *See, e.g.*, *Mercy Cath. Med. Ctr.* v. *Thompson*, 380 F.3d 142, 160 (3d Cir. 2004) ("In the Rule 34 context, control is defined as the legal right to obtain required documents on demand."); *In re Bankers Tr. Co.*, 61 F.3d

is contested," the party requesting discovery of documents "bears the burden of establishing" that the documents are within the producing party's "possession, custody, or control." *Alexander Interactive, Inc.* v. *Andorama, Inc.*, 2014 WL 61472, at *3 (S.D.N.Y. Jan. 6, 2014). Plaintiffs did not meet their burden here, and the district court erred in finding otherwise.

## A. The Republic Does Not Have the "Right" or "Authority" Under Governing Argentine Law to Access Communications on Officials' Personal Devices or Accounts.

Because the custodians and devices here are located in Argentina, and because Argentine law governs the relationship between the Republic and its current and former officials, the question of legal and practical control requires consideration of Argentine law. In its initial order, the district court simply ignored Argentine law, holding that under "principles of international comity" the court "need not decide" questions related to "the applicable Argentine laws and what exactly the laws allow." S.A. 52. On reconsideration, the district court backtracked. It "[a]ssum[ed], without

---

465, 469 (6th Cir. 1995) ("[D]ocuments are deemed to be within the 'possession, custody, or control' for purposes of Rule 34 if the party has *actual* possession, custody or control, or has the legal right to obtain the documents on demand."); *Searock* v. *Stripling*, 736 F.2d 650, 654 (11th Cir. 1984) ("Control is defined . . . as the legal right to obtain the documents requested upon demand."). The proper test is legal—not practical—control, and it is beyond dispute that the Republic does not have legal control of the personal devices and accounts belonging to high-ranking government officials. Because binding circuit precedent provides otherwise, the Republic applies this Circuit's more flexible test here—but preserves the argument for possible en banc or Supreme Court review that legal control is the correct inquiry.

deciding, that Argentine law applies" to the question of control under Rule 34. S.A. 83. The court then incorrectly held that the relevant Argentine laws "do not foreclose the finding that officials['] off-channel communications relating to 'state activity' . . . can be deemed 'public information' under Argentine law," and thus are within the Republic's "control" for Rule 34 purposes. S.A. 83.

1. The district court's holding that, as a matter of Argentine law, the Republic (and, more specifically, Argentina's Executive Branch) controls communications on current and former officials' personal devices and accounts is wrong. In the U.S. corporate context, courts applying the Second Circuit's "practical ability" standard often find that an employer "controls" documents held by its employee because a U.S. employer typically "can discharge the individual if he or she fails to cooperate in discovery." *Royal Park Invs. SA/NV* v. *Deutsche Bank Nat'l Tr. Co.*, 2016 WL 5408171, at *6 (S.D.N.Y. Sept. 27, 2016); *see Scott* v. *Arex, Inc.*, 124 F.R.D. 39, 41 (S.D.N.Y. 1989) (party controls records of third-party entities if he can obtain those records "on demand"). But that is not the case under Argentine law.

This Court has previously recognized that foreign law may offer employers less control over their employees' personal devices and accounts than U.S. law. In *Shcherbakovskiy*, this Court vacated sanctions imposed against the chairman of the board of a Russian corporation for failing to produce the corporations' documents,

holding that if "Russian law prevents his production of the documents, a finding of control cannot be sustained." 490 F.3d at 138-139. This Court then remanded the case to the district court with instructions to consider the appellant's "control" over the entity that possessed the documents, "Russian law," and the potential that "turn[ing] over the documents would subject [the appellant] to criminal sanctions under Russian law." *Id.* at 139.

Similarly, in *Owen* v. *Elastos Foundation*, a district court in this Circuit agreed that a Singapore company could not be compelled to produce the personal emails of its China-based employee because plaintiffs there did not meet their "burden" to establish "Singaporean or Chinese law as it bears on the 'control' question." 2023 WL 2537287, at *2-3 (S.D.N.Y. Mar. 16, 2023). The court therefore was "not willing to assume that [the non-U.S. employer] ha[d] the same 'practical ability' to coerce compliance from [the employee] that a U.S. corporation would have with respect to" documents in the possession of its employees. *Id.* at *2.[5]

---

[5] Plaintiffs briefly suggested below that only U.S. law matters for the question of control. *See* J.A. 1398. This Court rejected that premise in *Shcherbakovisky*. *See* 490 F.3d at 139 ("Russian law is relevant to the issues [of discoverability] and poses no threat to the sovereignty of the United States. . . . If Russian law prohibits appellant from obtaining and producing the documents . . . then the matter is at an end."). And for good reason. Under a legal control test, the relevant law must be the law governing the employee-employer relationship. And as to practical control, that must involve consideration of real-world constraints—here imposed by Argentine law.

The reasoning of *Shcherbakovisky* and *Owen* applies squarely here. Contrary to plaintiffs' baseless contention that "we don't think this is a big deal at all," J.A. 1593, multiple provisions of Argentine constitutional and criminal law prevent the Republic from accessing—much less controlling—communications on personal accounts and devices. The Argentine Constitution protects a "right to [one's] property," which encompasses the complete set of "tangible and intangible assets" belonging to a person. J.A. 421; *see* Argentine Constitution, Art. 17 (S.A. 89). The Republic cannot simply take possession of its current and former officials' personal property because their "[p]roperty is inviolable" under the Argentine Constitution. J.A. 421, 423. The Argentine Supreme Court also has underscored that this private property is "inviolable" absent a judgment or court-ordered criminal investigation against the individual owner of the property at issue, where that person is afforded the right to be heard. J.A. 421, 423.

"The extensive concept of the right to property is articulated with another fundamental right, the right to privacy, based on the dignity of the human person and also protected in the Argentine Constitution." J.A. 422; *see* Argentine Constitution, Arts. 18, 19 (S.A. 90). Under Argentine law, as the Republic's expert explained in the district court, officials' communications on personal devices and accounts "are presumed to be private." J.A. 423. Any invasion of individuals' privacy rights "must be expressly and exhaustively authorized in a law that guarantees due process

to the person affected," which is limited to criminal investigations authorized by Argentine courts. J.A. 423.

Indeed, the Argentine Criminal Code (Articles 153 and 153 *bis*) makes it a *crime* for anyone, including a Republic official, to access or seize personal devices and accounts of any person, including of its officials, or to collect their contents, without consent or the lawful order of an Argentine criminal court. J.A. 424-425. Article 153 prohibits unauthorized access to "an electronic communication . . . or other type of message," with criminal sanctions of up to one year's imprisonment "if the perpetrator also communicates to another or publishes the content" of the communication. S.A. 173. Article 153 *bis* prohibits unauthorized access to "a restricted access computer system or data," with criminal sanctions of up to six months' imprisonment, or up to one year "when the access is to the detriment of a computer system or data of a public state agency or of a provider of public services or financial services." S.A. 173. And those criminal penalties are "aggravated in the case of public officials who commit the unlawful action," which is what the district court's order would require. J.A. 424-425.

2.     The district court nevertheless concluded that if private accounts are used for government business, then they are "public information" that falls within the Republic's authority to collect. S.A. 83. That flawed analysis of Argentine law misunderstands the basic concept of "public information" and how it applies here.

*First*, the district court started from the incorrect premise that, "[i]f the communications are 'public documents,' by collecting them the Republic would not violate [Argentine law]." S.A. 78. Whether information might be deemed "public information" under Argentine law does *not* give the Republic access to the devices and accounts on which that information might appear. As the Republic's Argentine-law expert explained, the question of "public information" arises under the Republic's analogue to the U.S. Freedom of Information Act (FOIA), 5 U.S.C. § 552. *See* J.A. 417; *see also* Right of Access to Public Information Law, Law No. 27,275 (S.A. 113); Decree No. 206/2017 (S.A. 135). It is relevant only to whether members of the public may access "emails and internal documents created or exchanged between Argentine government officials *involving various devices under the possession, control or custody of the national government*." J.A. 414 (emphasis added); *see* Right of Access to Public Information Law, Law No. 27,275, Art. 7 (S.A. 115) (list of entities obligated to grant access to public information).

Regardless of whether something could be classified as "public information" under the access-to-information regime, that does not mean that the Republic has the ability to collect that information if it is housed in devices that, as a matter of Argentine law, the Republic is barred from accessing. Indeed, Article 2 of Law No. 27,275 provides that "The right of access to public information comprises the possibility to seek, access, request, receive, copy, analyze, reprocess, reuse, and

freely redistribute information *under the custody of the obligated parties enumerated in Article 7 of this law*, subject only to the limitations and exceptions established by this regulation." S.A. 115 (emphasis added). Thus, even if the communications on officials' own devices could be considered "public information," the Republic would still not have the right or ability to seize or access those officials' private property without consent or Argentine legal and judicial authorization.

*Second*, the district court erred in concluding that the off-channel communications constitute public information under Argentine law. The district court appears to have taken the simplistic view that, "to the extent that the official is doing official business on the phone, then those communications are official documents." J.A. 1607. But as the Republic's Argentine-law expert explained, under Decree No. 780/2024, "preparatory deliberations and working papers, or the preliminary examination of 'a matter' are not public documents" subject to disclosure. J.A. 1148; *see* Decree No. 780/2024 (S.A. 153) (public information "excludes by its very nature information that is in the private sphere of the official"). Because the off-channel communications are not acts of government subject to the public-disclosure regime, they are by definition not "public information." Indeed, if the communications were public information, plaintiffs could submit a simple administrative request for them, similar to a FOIA request. But tellingly, plaintiffs have not tried to do so.

At bottom, the district court misunderstood the role of "public information" under Argentine law—an error it could have avoided by giving "respectful consideration" to the Republic's explanation of the basic operation of its own laws. *Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co.*, 585 U.S. 33, 36 (2018). Argentina's "public information" system is akin to FOIA in the United States. 5 U.S.C. § 552. That is, it establishes a public right of access to certain types of documents that are in the government's possession. It is not a standard to determine *what* is in the government's possession or control, nor can it be used to bring materials into the government's control that the government does not already possess or control.

## B. The District Court Wrongly Concluded That the Republic Has the "Practical Ability" to Gather the Communications on Personal Devices and Accounts.

The district court alternatively held that, putting aside its "public information" error, the Republic "still has the 'practical ability' to receive the communications through other legal avenues." S.A. 83. Specifically, the court held that the "Republic can (1) request the consent of the individual officials; (2) amend the law by statute; or (3) order it through the Argentine courts." S.A. 83-84. The Republic already has sought cooperation from each custodian, and is in the process of collecting relevant communications from the individuals who have agreed to cooperate. But to date, several high-ranking officials have declined consent,

invoking their rights under Argentine law, and most of the former officials from the previous administration have not responded at all.[6]  As to the refusals or lack of responses, that leaves only the second and third avenues.  Neither is an appropriate avenue for establishing control by the Republic within the meaning of Rule 34.

1.     The district court's suggestion that the Republic could comply with the order by "amend[ing] its law by statute" is a non-starter.  As this Court has held, a U.S. court lacks the authority to require "the legislature of a foreign sovereign" to "enact or change a law."  *In re Austrian, German Holocaust Litig.*, 250 F.3d 156, 164-165 (2d Cir. 2001); *see Kallas* v. *Egan*, 842 Fed. Appx. 676, 679 (2d Cir. 2021) ("[F]ederal courts may not require Congress and state legislatures to exercise their legislative powers.").  Just as a U.S. district court cannot direct the U.S. President to "amend the law," it cannot require the Argentine Executive Branch, led by its democratically elected President, to seek an amendment to the country's laws.  If the Republic cannot get its hands on these devices and accounts without an Act of the Argentine Congress, that is a surefire sign that it lacks practical control over them.

---

[6]  Although the Republic has had some success obtaining consent, this appeal is not moot.  Several current and former officials have refused to voluntarily provide communications on their personal devices or accounts, or have not responded to the Republic's request for voluntary consent.  And even as to the officials who have consented, the Republic maintains that discovery of personal devices and accounts is not relevant or proportionate to the post-judgment needs of the action under Rule 26.  *See infra* Section II.

2.  That leaves an order of the Argentine courts. It is difficult to understand even what the district court meant by this. As with courts in the United States, Argentine courts are an independent branch of government. The Republic, represented here by its Executive Branch, has no ability to direct its independent judiciary to "order" its officials to produce communications. The only mechanism for the Republic to seek an Argentine court order to obtain the officials' personal devices would be in the context of a criminal proceeding in which the criminal court had reason to believe that the personal devices contained evidence of the crime under investigation. *See* J.A. 423 (Argentine-law expert explaining that she is "not aware of the existence of any law that, outside a criminal proceeding before Argentine courts, authorizes the National State to access or intrude in any way into the private means of communication of its officials"). No criminal proceedings currently exist in which such orders could lawfully be sought.

Instead, the appropriate procedure to obtain documents from non-parties in Argentina is through letters rogatory to an Argentine court under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, to which the United States and Argentina are parties. Each of the custodians is an Argentine national residing in Argentina, and the custodians here are "non-parties" in this action. S.A. 76. "[A] chorus of federal courts have held that where, as here, a party seeks discovery from a nonparty foreign national residing in a foreign country

over whom the court lacks jurisdiction, such discovery is governed by the Hague Convention." *McCarthy* v. *Johnson*, 2022 WL 3038862, at *4 (D.D.C. Aug. 2, 2022) (collecting cases); *see, e.g.*, *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2023 WL 5322019, at *2 (S.D.N.Y. Mar. 8, 2023) ("Both Bowley and Duffy are . . . non-parties and reside in the United Kingdom outside the Court's jurisdiction. The parties are able to secure their documents and testimony only by letter of request."). Indeed, "when discovery is sought from a non-party in a foreign jurisdiction, application of the Hague Evidence Convention is virtually compulsory." *McCarthy*, 2022 WL 3038862, at *4 (alterations omitted) (quoting *Tulip Computs. Int'l B.V.* v. *Dell Comput. Corp.*, 254 F. Supp. 2d 469, 474 (D. Del. 2003)).[7]

Here, plaintiffs have repeatedly refused to seek letters rogatory under the Hague Convention, despite the Republic's suggestions that they do so. That refusal

---

[7] In *First American Corp.* v. *Price Waterhouse LLP*, 154 F.3d 16 (2d Cir. 1998), this Court confronted the rare circumstance in which discovery of a foreign non-party can be sought outside the Hague Convention. *First American* affirmed the district court's enforcement of a subpoena issued directly to a foreign corporation subject to personal jurisdiction in New York. *Id.* at 19-20. This Court explained that it was reasonable to operate outside the Hague Convention in the particular circumstances of that case, because there was "no collision between the American discovery rules and the British confidentiality laws" and because British courts already "had the opportunity to determine the scope of their nondisclosure law in the first instance and have concluded that it poses no obstacle to discovery." *Id.* at 23. None of those factors is relevant here: the subpoena was not issued directly to these officials, there has been no determination that the officials are subject to personal jurisdiction in New York, and no Argentine court has considered—much less endorsed—the discovery plaintiffs seek.

does not entitle them to obtain discovery by means not permitted by U.S. or Argentine law. *See Shcherbakovskiy*, 490 F.3d at 138 (noting that it is "fairly obvious" that an opposing party "need not seek . . . documents [outside its possession] from third parties if compulsory process against the third parties is available to the party seeking the documents").

## II. DISCOVERY OF CURRENT AND FORMER OFFICIALS' PERSONAL DEVICES AND ACCOUNTS IS NEITHER RELEVANT NOR PROPORTIONAL TO THE NEEDS OF THIS CASE.

Even if the Republic somehow had "possession, custody, or control" over its officials' personal devices and accounts, that discovery would still be impermissible. Federal Rule of Civil Procedure 26 requires that discovery be both relevant and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). In 2015, the Advisory Committee amended Rule 26 to "[r]estor[e] proportionality as an express component of the scope of discovery." Fed. R. Civ. P. 26 Advisory Committee's Note to 2015 Amendment; *see Vaigasi* v. *Solow Mgmt. Corp.*, 2016 WL 616386, at *13 (S.D.N.Y. Feb. 16, 2016), *aff'd*, 750 Fed. Appx. 37 (2d Cir. 2018). Rule 26 directs courts "to assess proportionality by reference to several factors, including . . . 'the importance of the discovery in resolving the issues [at stake in the action].'" *Strike 3 Holdings, LLC* v. *Doe*, 964 F.3d 1203, 1207 (D.C. Cir. 2020) (quoting Fed. R. Civ. P. 26(b)(1)). "Thus, proportionality and relevance are conjoined concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be

disproportionate, and *vice versa*." *Royal Park Invs. SA/NV* v. *Deutsche Bank Nat'l Tr. Co.*, 2018 WL 4682220, at *15 (S.D.N.Y. Sept. 28, 2018) (internal quotation marks and alterations omitted).

### A. Discovery of Current and Former Officials' Personal Devices and Accounts Is Not Relevant to Execution.

The discovery ordered by the district court is not relevant to plaintiffs' efforts to execute on their (non-final) judgment. As the Supreme Court has instructed, parties may not seek discovery that "could not possibly lead to executable assets" because such information "is simply not 'relevant' to execution in the first place." *See Republic of Argentina* v. *NML Cap., Ltd.*, 573 U.S. 134, 144-145 (2014); *see also Underwood* v. *Coinbase Glob., Inc.*, 2025 WL 1984293, at *2 (S.D.N.Y. July 17, 2025) ("party seeking discovery bears the burden of demonstrating its relevance"); *cf. EM Ltd.* v. *Republic of Argentina*, 473 F.3d 463, 486 (2d Cir. 2007) ("We are mindful that a federal trial court has wide latitude over the management of discovery, but in the FSIA context, 'discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination.'" (citations omitted)). Here, the Personal Device Order seeks information that cannot possibly lead to executable assets for at least four reasons.

*First*, the Personal Device Order is directed at "determin[ing] whether [certain fully or partially] state-owned entities are alter egos," S.A. 53, but this Court and other courts have already held that those entities are *not* alter egos. The Supreme

Court has long recognized a presumption that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *First Nat'l City Bank* v. *Banco Para El Comercio Exterior de Cuba (Bancec)*, 462 U.S. 611, 626-627 (1983). Time after time, litigants have failed to overcome that presumption with respect to the very same entities at issue here.

For instance, in *Seijas* v. *Republic of Argentina*, this Court affirmed summary judgment dismissing an alter-ego claim against BNA. 502 Fed. Appx. 19 (2d Cir. 2012). The Court found that even "when taken in the light most favorable to plaintiffs, the evidence shows only that Argentina exercised its rights as sole shareholder to appoint BNA's directors, BNA's lending activity was consistent with Argentinian law and its charter, and BNA arguably could have been more transparent in its accounting practices." *Id*. at 22-23.

Likewise, in *Hercaire International, Inc.* v. *Argentina*, the Eleventh Circuit overturned a finding that Aerolíneas was an alter ego of the Republic, noting the significant "policy considerations underlying the recognition of Aerolineas' separate juridical existence" and the Supreme Court's "warning" in *Bancec* that "the presumption of independent status is not to be lightly overcome." 821 F.2d 559, 564-565 (11th Cir. 1987). As the Eleventh Circuit concluded: "Having had no connection whatsoever with the underlying transaction which gives rise to

Argentina's liability, it would be manifestly unfair to subject Aerolineas' assets to such attachment." *Id.* at 565. The same is true here, where four out of the five entities have no connection at all to this dispute, and as to the fifth entity, there is no allegation that any assets of YPF were used for commercial activity relating to the claim. Courts have made similar findings as to each of the purported alter-ego entities. *See supra* n.3. Tellingly, neither plaintiffs nor the district court has set forth any reason why those determinations no longer hold.

*Second*, plaintiffs put forth no basis for concluding that discovery of personal devices and accounts of the custodian government officials would uncover any information relevant to plaintiffs' alter-ego theories. The district court's order was based on a single conclusory statement, with no basis in the record, that "it seems obvious that these officials are conducting official business on their personal accounts." S.A. 53. That statement, in turn, was based on a single news article noting that a non-custodian sent unspecified WhatsApp messages to another government official. J.A. 1215. The news article does not say anything about the content of those messages, much less that they relate to official business. And it is even less clear how the exchange of unspecified messages between two members of the government could be used to establish a basis for alter-ego discovery from other individuals as to other entities.

41

Plaintiffs' other purported evidence similarly consists of rumors in news articles that some government officials use WhatsApp or other messaging platforms, without any specificity as to the content of those messages and no indication that they relate to official business. For example, plaintiffs have cited a video showing a WhatsApp message reading, "I love you, Toto!!! You're the best of the best!!!" with the response, "Haha, me too!! Shoulder to shoulder, let's go!!"—hardly official government business. J.A. 1489. Ironically, plaintiffs have also cited a video in which the President showed his phone to a journalist to show that there were *no communications* with another politician. J.A. 1494-1495. That is far too thin a reed for speculating that widespread government work—let alone any work related to the five purported alter-ego entities—is done on private devices, and thus demanding that those devices be subject to scrutiny.

*Third*, even if the entities *were* found to be alter egos, their assets would be immune from execution under the FSIA. The only potential exception of the FSIA that could theoretically apply here is the exception for "property [that] is or was used for the commercial activity upon which the claim is based." 28 U.S.C. § 1610(a)(2). Yet plaintiffs have never even identified any specific property held by the purported alter egos that they wish to execute upon, much less made a showing that such property was used for the commercial activity on which their claim is based. Nor could they: plaintiffs' underlying claims have nothing to do with the assets of these

entities. For that reason, the entities' assets fall outside the scope of the only available FSIA exception to sovereign execution immunity and thus cannot be executed upon in any circumstance.

*Fourth*, the district court has no jurisdiction to enforce a judgment against the Republic by imposing alter-ego liability on any of these entities. In *Peterson* v. *Bank Markazi*, this Court held that in a case proceeding against a foreign sovereign, the court's "[a]ncillary jurisdiction does not extend . . . to an action to establish liability on the part of a third party," and a plaintiff must institute a "new proceeding" against a purported alter-ego entity and demonstrate an independent basis for jurisdiction "to establish liability for the judgment." 121 F.4th 983, 999-1000 (2d Cir. 2024) (cleaned up). Plaintiffs have previously relied on the Third Circuit's opinion in *Crystallex International Corp.* v. *Bolivarian Republic of Venezuela*, 932 F.3d 126 (3d Cir. 2019), as support for ancillary jurisdiction, but this Court has expressly disagreed with that case. *See Bank Markazi*, 121 F.4th at 1000 n.6 ("[T]o the extent that the *Crystallex* court based its jurisdictional holding on a determination that ancillary jurisdiction extends to post-judgment proceedings against a foreign sovereign's instrumentality that was not party to the underlying merits proceeding, we disagree."). Here, the alleged alter-ego entities are not before the district court, so the court cannot make any alter-ego determinations about these entities as a basis for executing on their assets. Accordingly, any discovery aimed at their alleged

alter-ego status is not "relevant to execution . . . under Rule 26." *Gujarat State Petroleum Corp.* v. *Republic of Yemen*, 2022 WL 1567464, at *8 (S.D.N.Y. May 18, 2022) (quotations omitted).

### B. Discovery of Current and Former Officials' Personal Devices and Accounts Is Unduly Burdensome.

Weighty concerns on the other side of the balance also strongly counsel against the Personal Device Order. Even if plaintiffs' alter-ego guesswork based on rumors and one-off news articles might clear the bar of minimal relevance, it is vastly outweighed here by the burdens and foreign-policy implications of the Personal Device Order. The order intrudes on the personal devices and accounts of another sovereign's highest-ranking officials—in sensitive positions like Chief of Cabinet and Minister of the Economy. It would be the equivalent of another country ordering the U.S. Secretary of the Treasury to hand over his personal cellphone. Even worse, the order directs the Republic to collect and produce communications from *former* officials from the previous administration—effectively requiring these former officials to hand over their personal devices and accounts to their political rivals.

Such intrusive and burdensome discovery would doubtless cause international conflict. But the district court paid no more than lip service to the Supreme Court's warning to "exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome discovery may place them in a disadvantageous position," and to "demonstrate due respect . . . for any sovereign

44

interest expressed by a foreign state." *Société Nationale Industrielle Aérospatiale* v. *U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 546 (1987). There is simply no way a district court acting within the guiderails drawn by the Supreme Court could find that it was "respect[ful]" or "vigilan[t]" of foreign law to permit broad discovery into dozens of high-ranking current and former government officials' personal devices and accounts. That is especially true here, where the discovery has no concrete relationship to execution, but rather is just another frolic to try to find some support for plaintiffs' inchoate and baseless alter-ego theories. Even if there were no other clear legal mistake in the district court's order—and there were many—it was a basic abuse of discretion to order intrusive discovery in these extraordinary circumstances.

## CONCLUSION

For the foregoing reasons, this Court should reverse.

Respectfully submitted,

/s/ Robert J. Giuffra, Jr.

| | |
|---|---|
| Amanda F. Davidoff | Robert J. Giuffra, Jr. |
| Thomas C. White | Sergio J. Galvis |
| Morgan L. Ratner | Adam R. Brebner |
| SULLIVAN & CROMWELL LLP | Pedro José Izquierdo |
| 1700 New York Avenue NW | Arturo Carlos Schultz |
| Washington, DC 20006 | SULLIVAN & CROMWELL LLP |
| (202) 956-7500 | 125 Broad Street |
| | New York, NY 10004 |
| | (212) 558-4000 |
| | giuffrar@sullcrom.com |

*Attorneys for the Argentine Republic*

November 17, 2025

## CERTIFICATE OF COMPLIANCE

This Brief complies with Federal Rule of Appellate Procedure 32(a) and Local Rule 32.1(a) because it contains 10,591 words.

This Brief also complies with the requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared in 14-point font using a proportionally spaced typeface.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

November 17, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2025, I filed the foregoing Brief with the Clerk of Court for the U.S. Court of Appeals for the Second Circuit through the ACMS system. I certify that all participants in these cases are registered ACMS users and that service will be accomplished by the ACMS system.

*/s/ Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.

November 17, 2025